

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

July 3, 1959

Honorable Menton J. Murray, Chairman
Conservation and Reclamation Committee
State of Texas
House of Representatives
Austin, Texas

Opinion No. WW-661

Re: Constitutionality of
House Bill 14, 56th
Legislature, 2nd C.S.,
dealing with public
use of beaches.

Dear Mr. Murray:

You request the opinion of this department as to
the constitutionality of the committee substitute for House
Bill 14 of the 56th Legislature, 2nd C.S., which deals with
public use of the beaches along the open waters of the Gulf
of Mexico.

Construing the statute as a whole, as we are re-
quired to do under standard rules of statutory construction,
we think it clear that the Act involves three types of rights
in the public to use the beaches as follows:

        a.  Ownership.
        b.  Prescriptive right.
        c.  Rights under police power

In court proceedings involving the first two above
mentioned rights the burden of proof is placed on the upland
owner, a phase of the bill which we discuss further on in
this opinion.

We first examine the question of whether such pro-
visions of the Bill represent an unlawful taking for public

use without compensation, and violate due process of law contrary to applicable constitutional provisions.

Of course, if the public owns the property, there is no taking. If the public has an easement by prescription to use the beaches, the Act creates no new right. It recognizes such rights in the public but these may be rebutted under Section 3 by a showing that no such rights exist. There is no taking, therefore, under this phase of the Bill, since no additional property interests are granted beyond that which the public may already own.

It has long been recognized in Texas that the public may acquire a prescriptive right. Of interest is the following language in the early Texas case of Compton v. Waco Bridge Company, 62 Tex. 715, 722:

> "Even before the earliest settlement by
> white men it seems that the Indians,
> while yet their campfires blazed along
> its banks, had by use established this
> as a ford, where the tribes crossed
> and recrossed the Brazos at will. And
> when the Indian, obedient to his fate,
> moved on toward the setting sun, and
> the white man settled the country,
> this ford was continued, and continuously
> used as a public crossing, interrupted
> only by high water, until 1876. It
> would seem that the public by constant
> use had secured a right to this ford,
> by presumptive dedication, and also by
> prescription."

And see Phillips v. T. & P. Ry. Co. 296 S.W. 877 (Comm App. 1927); Perry v. Jaggers, 9 S.W. 2d 143, err. dism; T. & P. Ry. Co. v. Gaines, 27 S.W. 266.

The bill next recognizes the existence of and confirms the grant to the public of certain rights arising under the police power by designating the Gulf beaches as a "coastal safety, sanitary, and defense zone," and requires the beaches to "remain open," which we interpret to mean free from barriers obstructing travel along the beaches, for certain purposes connected with the police power. As we interpret this phase of the bill, it is not based upon any ownership of or easement on the beaches in favor of the public. On the other hand it does impose burdens on any private ownership of the

beaches in favor of the public interest in matters which may be generally classed as of an emergency nature.

Perhaps the leading case dealing with the constitutionality of such legislation is the case of Lombardo v. City of Dallas, 73 S.W. 2d, 475, wherein the Dallas zoning ordinance, as well as the statutes authorizing same (Articles 1011a to 1011j, V.C.S.), were upheld. Immediately at stake was the right to build a filling station in a zoned residential neighborhood. It was urged that this interference by the zoning ordinance with the use by the landowner of his property was a public taking without compensation. The same contention is urged here because of the prohibition in the bill against building obstructions on the beach.

Chief Justice Cureton, in discussing the police power in the Lombardo case at page 479, adopted the following language from a decision of the Supreme Court of the United States:

> "Uncompensated obedience to a regulation enacted for the public safety under the police power of the State is not taking property without due compensation, and the constitutional prohibition against the taking of private property without compensation is not intended as a limitation of the exercise of those police powers which are necessary to the tranquility of every well-ordered community, nor of that general power over private property which is necessary for the orderly existence of all governments. . .

> We hold that the police power of a state embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals, or the public safety."

Concerning the nature of the police power of the State, 16 C.J.S. 891, Constitutional Law, Section 175 says:

> "The police power is a governmental function, an inherent attribute of sovereignty, and the greatest and most powerful attribute of government. It was born with civilized

government, and was possessed by every state before the union was formed. Although the basis of the police power lies in the constitution which regards the public welfare, safety, and health of the citizens of the state, and although it may be given to the people of the state by the constitution, the power exists without any reservation in the constitution, being founded on the duty of the state to protect its citizens and provide for the safety and good order of society.

"In its nature it is very broad and comprehensive, elsewhere and otherwise described or defined as a very high power, and the laws enacted for the purpose of regulation thereunder may be impolitic, harsh, and oppressive without contravening the constitutional inhibition. It corresponds to the right of self-preservation in the individual, and is an essential element in all orderly governments, because necessary to the proper maintenance of the government and the general welfare of the community. . .

"Generally police power operates in the field of regulation, except possibly in some cases of emergency such as conflagration or flood when private property may be temporarily used or damaged or even destroyed to prevent loss of life or to protect the remaining property of an entire locality."

There can be no doubt that in certain periods of emergency, in the very nature of the police power, private property becomes subject to public use. Officers may pursue felons onto private property, otherwise society would be at the mercy of criminals. Firemen may even destroy private property to stop a spreading conflagration. Planes or boats in distress may be forced to land on private property. Health authorities are at times forced to go on private property to abate sanitary hazards. Defense forces in event of enemy attack must be deployed across property lines.

We are of the opinion, however, that the right under the police power to go upon private property is limited to conditions of emergency, of which the above are examples, where lives, health, property, law enforcement and the like are at stake. We think, therefore, that the various purposes listed in Sec. 2 of the Bill must be limited to such emergencies and that any purpose listed which does not fall within such category is invalid. The bulk of the purposes listed are clearly of an emergency nature and are valid under the police power. The effect of the bill, insofar as this phase of it is concerned, is, through regulations closely akin to zoning and city building codes, to require a building setback as to the beach area in which no fences or other obstructions are to be allowed, so as to facilitate the passage of vehicles in time of public emergency.

A city orginance containing a building setback rule was specifically upheld by the Supreme Court in Halsell v. Ferguson, 202 S.W. 317. The case points out the two conditions for the exercise of the police power: reasonableness of the legislation and promotion of public welfare. The court said at page 321:

"Since these regulations appear reasonable, and since they promote the general convenience and the public welfare, we cannot regard them as subject to attack on constitutional grounds.

"Coming within the police power, appellants have to submit to these regulations, without regard to compensation."

For a time in the history of Texas jurisprudence there appears to have been some doubt as to whether the police power was superior to rights of property. The Lombardo case, supra, seems, however, to have laid this matter to rest, the court saying at page 478:

"The insistence that the right of property or the unrestricted use of property is not subject to the police power has long since been determined adversely to that contention."

Subsequent Supreme Court decisions are in accord.

In R.R. Commission v. Rowan Oil Co., 259 S.W. 2d

173 (1953), the Court stated: "All property is held subject to a valid exercise of the police power."

In Town of Ascarate v. Villalobos, 223 S.W. 2d 945, 950, the Court quoted with approval this language:

"Since the very foundation of the police power is the control of private interests for the public welfare, a statute or ordinance is not rendered unconstitutional by the mere fact that private rights of person or property are subjected to restraint or that loss will result to individuals from its enforcement."

The question of police power versus property rights was brought into sharp focus in the recent case of State v. Richards, 301 S.W. 2d 597 (1957). The Supreme Court upheld a statute authorizing confiscation of an automobile driven by a narcotics violator who had borrowed it from an innocent owner. The dissenting opinion in what both sides admitted was a harsh case on the facts, stoutly insisted that the police powere was subordinate to property rights. Justice Walker, speaking for the court majority, said:

"Police regulations are not unconstitutional merely because they operate as a restraint upon private rights of person or property or will result in loss to individuals. Damage to or loss of property resulting from a proper exercise of such power does not constitute a taking of property under the right of eminent domain, and compensation is not required to be made therefor. . . A large discretion is necessarily vested in the Legislature to determine not only what the interests of the public require, but what measures are necessary for the protection of such interests. If there is room for a fair difference of opinion as to the necessity and reasonableness of a legislative enactment on a subject which lies within the domain of the police power, the courts will not hold it void."

To the same effect see opinion by Justice Norvell in City of Corpus Christi v. Jones, 144 S.W. 2d 388 (1940), err. dism., jt. corr. And see Williams v. State, 176 S.W.2d

177, 182, for a review of the police power by the Court of Criminal Appeals.

The phase of the bill under consideration does not of itself authorize indiscriminate public travel on the beaches. Rather it keeps the beaches open by a "building setback" provision in order that a way may be clear for vehicles, should a public emergency arise. The bill contains numerous exceptions designed to lessen the inconvenience occasioned the upland owner. The beaches give primary access to the sea, and in view of the purposes stated in Sec. 2, we cannot say that such an exercise of the police power is unreasonable. Accordingly, we are of the opinion that such portion of the bill is constitutional.

With reference to the presumption created in the bill, the power of the Legislature to create a presumption of the existence of certain facts upon proof of other facts has been the subject of many and varied discussions by the courts and text writers of this country. The reported cases dealing with the subject are legion. See Annotations in 51 A.L.R. 1139, 162 A.L.R. 513, and 46 A.L.R. 2d 1176.

The presumptions here under consideration are set forth in Section 3 of the Bill. It is there provided:

"The area defined in Section 2 above shall be presumed to be subject to the public uses and easements described in Section 2 unless the same is rebutted by a claimant of ownership or exclusive rights in said land, which claimant shall have the burden of establishing clearly, that

"a. The ownership or right to exclusive possession of the seashore in question is in claimant, and

"b. Such ownership includes a right to exclude persons from the use of the seashore for the purposes stated in Section 2 of the Act, and

"c. There has been established no prescriptive right as against such claimant by the public, or by the person or persons using the seashore as an easement

to the sea. Provided that it shall be
sufficient for claimant to show that no
prescriptive right was obtained during
the 25 years immediately preceding the
action. This proviso shall not preclude
affirmative proof by the State that such
prescriptive right was obtained more
than 25 years preceding the action and
is still in effect."

The question presented is whether the creation
of such a statutory presumption violates the "due process
of law" guaranteed by the Fourteenth Amendment of the
Federal Constitution and Article I, Section 19, Constitu-
tion of Texas.

It is important to note that the Bill does more
than create merely a prima facie presumption, that is,
one which will supply evidence to support a judgment in
the absence of contrary evidence of probative value and
which merely places the burden of "going forward" with
the evidence upon the opponent. This Bill places upon
the claimant of the area the "burden of persuasion", in
fact "the burden of establishing clearly" that the public
has not, within the period of 25 years preceding the
action, used the area in such a manner as to have matured
by prescription the rights and uses described in Section
2. Thus the Bill, if valid, would diametrically reverse
the common law doctrine which places the burden of "going
forward" as well as the burden of "persuasion" upon one
who seeks by a judgment to impress an easement on land
the record title to which is in another.

A leading case is Mobile, Jackson & Kansas City
R.R. Co. v. Turnipseed, et al., 219 U.S. 35, 55 L.Ed. 78,
decided by the United States Supreme Court in 1910. There
under attack as violating the due process clause was a
Mississippi statute which provided that in actions for
damages "proof of injury inflicted by the running of loco-
motives . . . shall be prima facie evidence of the want
of reasonable skill and care" in the operation of the
train. The court rejected the contention that the courts
of Mississippi by construing the act as creating a pre-
sumption of liability had in fact given it a greater
force that a mere temporary inference of fact. In this
connection the Court said:

". . . The statutory effect of the rule
is to provide that evidence of an injury

arising from the actual operation of trains
shall create an inference of negligence,
which is the main fact in issue. The only
legal effect of this inference is to cast
upon the railroad company the duty of pro-
ducing some evidence to the contrary. Then
the question of negligence is one for the
jury, upon all of the evidence. In default
of such evidence, the defendant, in a civil
case, must lose, for the prima facie case
is enough as a matter of law.

"The statute does not, therefore, deny
the equal protection of the law, or other-
wise fail in due process of law, because
it creates a presumption of liability,
since its operation is only to supply an
inference of liability in the absence of
other evidence contradicting such infer-
ence."

The court further laid down what may be taken as
a guide in testing the validity of statutory presumptions:

"That a legislative presumption of one
fact from evidence of another may not
constitute a denial of due process of
law or a denial of the equal protection
of the law, it is only essential that
there shall be some rational connection
between the fact proved and the ultimate
fact presumed, and that the inference of
one fact from proof of another shall not
be so unreasonable as to be a purely
arbitrary mandate. . ."

In rejecting the attack on the statute the court
finally concluded that, the injuries being caused by a de-
railed car, it was not "an unreasonable inference that a
derailment of a railway car is due to some negligence,
either in constructing or maintenance of the track or some
carelessness in operation." (p. 81)

In 1929 the Supreme Court of the United States
was again confronted with a state statute creating a pre-
sumption of negligence in accidents involving the opera-
tion of railroads. Thus, in Western & Atlantic RR. v.
Henderson, 279 U.S. 639, 73 L.Ed. 884, a Georgia statute
providing that a railroad company should be liable for
damages or injuries inflicted "by the running of the

locomotives. . . unless the company shall make it appear that their agents have exercised all ordinary and reasonable care and diligence, the presumption in all cases being against the company" was under attack as being in violation of due process.

The suit was occasioned by a grade corssing accident. The defendant had offered much evidence of its due care and, although plaintiff offered no evidence of several of the allegations contained in the complaint, the trial court instructed the jury that because of the statute the presumption arose that the company was negligent "in each of the particulars specified in the petition, and the burden thereupon shifts to the defendant company to show that its employees exercised ordinary care and diligence in such particulars." The Supreme Court said that by authorizing the jury, in the absence of evidence, to find negligence in the operation of the train, "the court necessarily permitted the presumption to be considered and weighed as evidence against the testimony of defendant", and it appearing that the courts of Georgia had construed the statute as applying evidence by presumption, proceeded to strike down the statute as creating an arbitrary presumption in violation of the due process clause. During the course of the opinion the court, in discussing legislation creating prima facie presumptions, said:

> "Legislation declaring that proof of one fact or group of facts shall constitute prima facie evidence of an ultimate fact in issue is valid if there is a rational connection between what is proved and what is to be inferred. A prima facie presumption casts upon the person against whom it is applied the duty of going forward with his evidence on the particular point to which the presumption relates. A statute creating a presumption that is arbitrary or that operates to deny a fair opportunity to repel it violates the due process clause of the 14th Amendment. Legislative fiat may not take the place of fact in the judicial determination of issues involving life, liberty of property. Manley v. Georgia, 279 U.S. 1, ante, 575, 49 Sup. Ct. Rep. 215, and cases cited." (Emphasis added) (73 L.Ed. 888)

It is our construction that the Turnipseed case, supra, is authority for the proposition that for a state statute creating a prima facie presumption to be valid there must be a logical connection between the facts proved and the facts presumed. In the specific fact case there in question the court found the inference of negligence (the presumption) logically to follow from the facts proved (the derailment of a railroad car).

In Henderson, supra, the appellee urged that the presumption created by the Georgia statute validly was and should be considered as evidence in the case, and relied for his position upon Turnipseed, apparently upon the ground that both statutes were similar in language and that the court in Turnipseed had found a reasonable relation between the facts presumed and the facts proved. The court expressly rejected this theory and, in referring to Turnipseed, said:

> ". . . That case is essentially different from this one. Each of the state enactments raises a presumption from the fact of injury caused by the running of locomotives or cars. The Mississippi statute created merely a temporary inference of fact that vanished upon the introduction of opposing evidence. Gulf, M & N R.R. Co. v. Brown, 138 Miss. 39, 66, et seq. 102 So. 855; Columbus & G.R. Co. v. Fondren 145 Miss. 679, 110 So. 365. That of Georgia as construed in this case creates an inference that is given effect of evidence to be weighed against opposing testimony and is to prevail unless such testimony is found by the jury to preponderate.
>
> "The presumption raised by § 2780 is unreasonable and arbitrary and violates the due process clause of the 14th Amendment . . ." (L. Ed. 888, 889)

While it might be argued that the court struck down the statute in the Henderson case because it found no logical connection between the grade crossing accident and the presumption of negligence on the part of the railroad, we think the more logical interpretation leads to the conclusion that it was because the statute, as construed by the Georgia courts, had the force of evidence. We are strengthened in this conclusion by the fact that a statute in Florida identical in words with the Georgia statute was held constitutional in the case of Atlantic Coast Line Company v. Voss, 136 Fla. 32, 186 So. 199, for the specific

reason that the courts of Florida construed the statute merely as creating a prima facie presumption which vanished when the Railroad Company produced probative evidence to the contrary. The Florida Supreme Court further noted that its statute had been upheld in Kirsch v. Atlantic Coast Line Railroad Company, 5 Cir. 28 Fed. 963 and, in effect, by the Supreme Court of the United States in the Henderson case supra, and in the case of Stringfellow v. Atlantic Coast Line Company, 290 U.S. 608, 78 L.Ed. 532.

In Commissioner of Internal Revenue v. Bain Peanut Co., 134 F.2d 853, 5 Cir., 1943, the Court, in discussing statutory presumptions said:

"The law governing burden of proof is a matter of substance. It is never the function of a rebuttable presumption to shift the burden of proof; its office is to supply an inference which may take the place of proof not otherwise produced. If the statutory presumption here invoked should be given the probative force accorded to it by the Board, it would have the effect of shifting the burden of proof; but it does not have this effect, because it is a mere rule of evidence and not of substantive law. It is a presumption that yields readily to evidence, direct or circumstantial, and has no effect in excess of a mere temporary inference of fact that casts upon the defendant the duty of producing sufficient evidence to rebut it. When that is done, the inference is at an end; it disappears entirely, and the burden of proof remains as it existed in the beginning. . . .

"If we compare the Turnipseed case with Western & A.R.R. Co. v. Henderson, 279 U.S. 639, 49 S.Ct. 445, 73 L.Ed. 884, we shall observe the difference between a statute that merely supplies an inference of fact in the absence of evidence contradicting such inference, and a statute that creates an inference that is given the effect of evidence to be weighed against opposing testimony. The latter presumption is unreasonable; and, between private parties, violates the due-process clause of

the Fourteenth Amendmant if created by an
Act of Congress."   (134 F.2d, 857, 858)

While the authorities which we have discussed
(and most others which we have examined in our research)
relate to tort actions, they would seem to apply with even
greater force to vested rights of property with which we
are presently concerned.  In view of such authorities,
it is our opinion, and you are so advised, that, as presently
drawn, Section 3 of H.B. 14, violates the due process clause
of the Federal and State Constitution and for that reason is
invalid.

In the interest of time, however, and on the
assumption that perhaps the committee might be interested
in revising this portion of the Bill, you are further ad-
vised that it is our opinion that the presumptions could
be made valid if they are revised so as to be made merely
prima facie, as discussed in Turnipseed and Henderson,
supra.  We are confident that a court would take judicial
notice of the fact that, when and where not barred there-
from by effective obstructions, members of the general
public have in fact used the sandy beach areas for the
purposes designated and set forth in the Bill.  Under
these circumstances proof of the location of land within
the area designated bears a logical connection with the
presumption of public use and should meet the tests laid
down by the cases discussed above.

## S U M M A R Y

As presently drawn Section 3 of H.B. 14,
56th Legislature, 2nd Called Session
contravenes the due process clause of the
Federal and State Constitution and is
therefore invalid.  The use of the area
for the emergency purposes set forth in
Section 5 is valid.

Very truly yours,

WILL WILSON
Attorney General

By:   James H. Rogers
      Assistant

J. Arthur Sandlin
Assistant

APPROVED BY:
OPINION COMMITTEE

George P. Blackburn, Chairman
John B. Webster
W. R. Scruggs
W. O. Schultz
C. K. Richards

REVIEWED FOR THE ATTORNEY GENERAL

By

W. V. Geppert